United States District Court
Southern District of Texas
**ENTERED**
November 09, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DELISE ADAMS, GLORIA FLORES-OLVERA, and JUDY PEREZ, | § § § | |
| Plaintiffs, | § § | |
| V. | § | CIVIL ACTION NO. 4:15-CV-01270 |
| | § | |
| MEMORIAL HERMANN, CHIPS ADAMS, and ARNOLD CARRASCO, | § § § | |
| | § | |
| Defendants. | § | |

## ORDER

Plaintiffs have sued Defendants for unlawfully interfering with their rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, and for unlawfully retaliating against them after they attempted to exercise those rights. Plaintiffs have also sued Defendant Memorial Hermann Health System in particular for employment discrimination on the basis of gender and pregnancy pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1]

Presently before the Court are Defendants' Motion for Summary Judgment [Doc. No. 53] and cross Motions to Disqualify Counsel [Doc. Nos. 66, 113, & 114]. Plaintiffs have also filed a Motion for Special Master and In Camera Review [Doc. No. 66].

---

[1] The parties agree that the individual Defendants, Arnold Carrasco and Helen "Chips" Adams, cannot be held liable under Title VII. *See* Defendants' Motion for Summary Judgment ("Defendants' MSJ"), Doc. No. 53, 19–20; Plaintiffs' Response in Opposition to Defendants' MSJ ("Plaintiffs' Response"), Doc. No. 58, 18 n.7. Accordingly, Memorial Hermann is the only Defendant facing the Title VII claim. Defendants do not contest the potential liability of the individual Defendants under the FMLA, and there is no reason to believe that they could have. *See* 29 C.F.R. § 825.104(d) ("[I]ndividuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA."); *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 415 & n.6 (3d Cir. 2012) (holding that "an individual supervisor working for an employer may be liable as an employer under the FMLA" and contrasting the definition of "employer" under the FMLA with the "much narrower" definition under Title VII).

For the reasons set forth below, the Court hereby denies Defendants' Motion for Summary Judgment with respect to Plaintiffs' claims for Title VII discrimination and FMLA retaliation. The Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' claim for FMLA interference. Furthermore, the Court denies both of the cross Motions to Disqualify Counsel and denies Plaintiffs' Motion for Special Master and In Camera Review.

I.      Material Facts

Plaintiffs are three former Memorial Hermann employees who worked in one of Memorial Hermann's Neighborhood Health Centers. Delise Adams (Plaintiff Adams) was a nurse practitioner for Memorial Hermann. Gloria Flores-Olvera and Judy Perez were medical assistants. Plaintiffs' supervisor was Arnold Carrasco, and Carrasco in turn reported to Helen "Chips" Adams (Defendant Adams). Carrasco was Memorial Hermann's Director of Outpatient Clinics for the Neighborhood Health Centers ("clinics") at the relevant times, and Defendant Adams was Memorial Hermann's Associate Vice President of Outpatient Clinical Services.

In 2014, Plaintiffs were each pregnant and each applied for and took leave under the FMLA. Flores-Olvera took leave from June to mid-September. Perez took leave from July to late September. Plaintiff Adams took leave beginning on August 25 that was scheduled to end in November.

Around August 26, 2014, Memorial Hermann announced that on September 30, 2014, it would close the clinic where Plaintiffs worked, the Southwest clinic ("the clinic"). The clinic evidently had seven employees in addition to the clinic doctor at the time of closure: the three Plaintiffs here as well as Margaret Watson (nurse practitioner), Rachel Magallanes (medical

assistant), Jeniffer Umana (medical assistant), and Marilou Macias (medical assistant).[2] All of the employees were being terminated due to the closure. Since Plaintiffs were on FMLA leave at the time, Carrasco called each Plaintiff and informed them that the clinic was closing and that Plaintiffs, like the other employees, could apply for positions in Memorial Hermann's other two clinics.

On August 27, the day after the announcement of the closure, Flores-Olvera applied for one of the positions at another clinic. Perez applied for positions at both of the other clinics. Plaintiff Adams never submitted an application, unlike Flores-Olvera and Perez.

Memorial Hermann rehired three employees from the closing clinic for positions elsewhere. For an open nurse practitioner position, Defendants hired Margaret Watson. For the two open medical assistant positions, Defendants hired Rachel Magallanes and Jeniffer Umana. The four employees whom Memorial Hermann did not rehire were the three Plaintiffs plus Macias. Macias had not been pregnant or taken FMLA leave, and she never applied for any position at another location.

Flores-Olvera and Perez completed their FMLA leave and returned to work in mid and late September respectively. When the clinic closed on September 30, since they were not rehired, Plaintiffs were terminated.

---

[2] Plaintiffs state, without citation, that these were the seven employees at the clinic prior to its closing. *See* Plaintiffs' Supplemented Response in Opposition to Defendants' MSJ ("Plaintiffs' Supplemented Response"), Doc. No. 107, 15–16. Defendants do not contest this roster of employees. Exhibit 29 to Plaintiffs' Supplemented Response, which appears to contain an attachment to a July 2, 2014, email from Carrasco to Jacqueline Patterson, shows the same roster of employees, except Umana is not listed (the roster also lists an additional employee as "Supplemental"). Exhibit 18 to Plaintiffs' Supplemented Response evidently shows that Umana only accepted an offer to work in the clinic on July 21, 2014, a fact that would explain her absence from the Exhibit 29 list. Based on this supporting evidence and the lack of any argument by Defendants to the contrary, the Court will treat the clinic as having the seven employees that Plaintiffs have listed.

II.    Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex Corp.*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

III.    Defendants' Objections to the Summary Judgment Evidence

Jacqueline Patterson is a former Memorial Hermann human-resources employee who was involved in discussions about closing the clinic. According to her deposition testimony, Patterson met with Carrasco in June 2014, well before the clinic closure was announced.[3] After the clinic had closed, she participated in discussions with Memorial Hermann's in-house and outside counsel regarding Plaintiffs' terminations. Defendants have objected to Patterson's testimony regarding

---

[3] Patterson Dep. 21–24.

her alleged conversations with Memorial Hermann's in-house and outside counsel on privilege grounds. Defendants have also objected to certain portions of her testimony regarding her alleged conversations with Carrasco on Best Evidence Rule grounds.[4]

The Court sustains in part and overrules in part Defendants' assertions of privilege. Specifically, the Court sustains the privilege objections with respect to conversations Patterson allegedly had with Memorial Hermann's in-house and outside counsel. The Court overrules the privilege objections with respect to actions that Patterson personally took. Furthermore, the Court sustains the greater part of Defendants' Best Evidence Rule objections. In Appendix A, the Court has set forth its particularized rulings on Defendants' objections based on the attorney–client and/or work-product privileges as well as objections based on the Best Evidence Rule.

In order for the attorney–client privilege to apply, "the proponent 'must prove: (1) that he made a *confidential* communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding.'" *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).

Whether the attorney–client privilege applies "is a 'highly fact-specific' inquiry, and the party asserting the privilege bears the burden of proof." *Id.* (quoting *Stoffels v. SBC Commc'ns, Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009)). "Once the privilege has been established, the burden shifts to the other party to prove any applicable exceptions." *Id.* (quoting *Perkins v. Gregg Cty.*, 891 F. Supp. 361, 363 (E.D. Tex. 1995)). "Ambiguities as to whether the elements of a privilege claim have been met are construed against the proponent." *Id.* "There is no presumption that a company's communications with counsel are privileged." *Id.* at 696.

---

[4] Defendants also object to portions of Plaintiffs' declarations. The Court, however, has not found it necessary to rely on any of the objected-to portions for purposes of summary judgment.

The work-product privilege protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . including the other party's attorney." Fed. R. Civ. P. 26(b)(3). The privilege is not absolute and may be overcome in circumstances where "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.* The Fifth Circuit has held "the privilege can apply where litigation is not imminent, 'as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (quoting *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982)). The "work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." *Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 441 (W.D. Tex. 2017) (quoting *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991)). "Like the attorney-client privilege, '[t]he burden of establishing that a document is work product is on the party who asserts the claim.'" *Id.* (quoting *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)).

The Federal Rules of Evidence state that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. This rule is often referred to as the Best Evidence Rule. As for Defendants' Best Evidence Rule objections, the Court's rulings are set forth in Appendix A. Plaintiffs and/or Patterson purport to testify to the contents of certain documents which they claim to have seen but which they do not possess. This testimony is not hearsay, but it clearly violates the Best Evidence Rule.

It is clear to this Court that Patterson's conversations with both in-house counsel, Sachin Bhandari, and outside counsel, Nehal Anand, related directly to the defense of the claims made by the three Plaintiffs in this case. Further, the Court sees no evidence of that privilege being waived and no evidence to support Plaintiffs' claims that the crime/fraud exception applies. Thus, any testimony concerning Patterson's conversation with Defendants' lawyers will not be permitted at trial and is not being considered as evidence as this Court rules on the pending summary judgment motion.

Further, this Court does not see the need for the disqualification of defense counsel. Asking for an employee's file to review in this kind of case is not evidence of a crime or fraudulent conduct. To the contrary, it would be evidence of malpractice and/or incompetence not to review these materials. Plaintiffs' Motion to Disqualify [Doc. No. 66] is denied, as is their Supplemented Motion to Disqualify [Doc. No. 113].

These evidentiary rulings resolve whatever breach of attorney–client or work-product privilege that occurred. Further, the Court has already indicated how the matter will be treated at trial. That being the case, there is no need at this time to disqualify Plaintiffs' counsel. Whatever lapses caused by Patterson's conduct or testimony will not prejudice Defendants nor will counsel's continued representation of Plaintiffs. Therefore, Defendants' Amended Motion to Disqualify [Doc. No. 114] is denied.

IV.     Title VII

Plaintiffs allege that Memorial Hermann discriminated against them on the basis of gender—more specifically, on the basis of pregnancy—in violation of Title VII of the Civil Rights

Act of 1964, as amended.[5] Plaintiffs acknowledge that the individual Defendants, Carrasco and Defendant Adams, are not subject to liability under Title VII.[6]

Title VII, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act of 1978 amended the definitions of "because of sex" and "on the basis of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions . . . ." 42 U.S.C. § 2000e(k); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 859 (5th Cir. 2002) ("The PDA amended Title VII by explicitly including discrimination based on pregnancy and related medical conditions within the definition of sex discrimination . . . .").

At the summary judgment stage, the question is whether there is a genuine issue of material fact regarding whether Memorial Hermann discriminated against Plaintiffs on the basis of sex. *See* Fed. R. Civ. P. 56(a); *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001). "Title VII affords employees the option of proving a violation through either direct or circumstantial evidence." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010). Where a plaintiff's case is based on circumstantial evidence, as it is in this case, the Court applies the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Under the *McDonnell Douglas* burden-shifting approach, Plaintiffs first have the burden to establish a prima facie case of discrimination. *Jackson*, 619 F.3d at 466. If Plaintiffs establish a

---

[5] Plaintiffs' claim is essentially a pregnancy-discrimination claim. Plaintiffs do not assert any gender-discrimination claim apart from their pregnancy-discrimination claim.
[6] Plaintiffs' Response, Doc. No. 58, 18 n.7.

prima facie case, then the burden shifts to Memorial Hermann to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If Memorial Hermann does so, Plaintiffs must then show that Memorial Hermann's "stated reason is pretextual and that the true reason is unlawful discrimination." *Gerdin v. CEVA Freight, L.L.C.*, 908 F. Supp. 2d 821, 827 (S.D. Tex. 2012).

"Evidence of pretext will permit a trier of fact to infer that the discrimination was intentional." *Id.* "In the summary judgment setting, the plaintiff's burden is not to persuade the court that defendant's explanation is incorrect but, rather, to raise a genuine issue of material fact for trial by presenting evidence that both (1) rebuts the defendant's nondiscriminatory reason, and (2) creates an inference that impermissible discrimination was a determinative factor in the challenged employment decision." *Id.* (citing *E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d 1173, 1180–81 (5th Cir. 1996)). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

A. Plaintiffs' Prima Facie Case

The parties disagree over what Plaintiffs must show in order to establish a prima facie case.[7] The crux of the disagreement is whether this case is a "reduction-in-force" case. Plaintiffs argue that it is not a reduction-in-force case, while Memorial Hermann says that it is. The contours of the applicable prima facie case depend on the outcome of this disagreement over how to characterize the case.

---

[7] Plaintiffs state that "[b]asically, the required prima facie showing . . . is the same" under both Plaintiffs' standard and Memorial Hermann's standard. Memorial Hermann, however, calls the Plaintiffs' elements "an incorrect standard."

**Reduction in Force**

Memorial Hermann contends that this was a straightforward reduction in force: Memorial Hermann permanently closed the clinic where Plaintiffs worked for legitimate business reasons, and Memorial Hermann terminated all employees but immediately rehired several at one of its other venues upon the clinic's closure. The three Plaintiffs, as well as Macias, did not secure other employment and were accordingly laid off. Plaintiffs offer several arguments to show that this case was not a reduction in force. First, the "only individuals that were terminated were the Plaintiffs." Plaintiffs allege that Macias, the fourth employee who did not continue her employment after the clinic closed, was not "terminated" but rather "resigned" because she deliberately did not re-apply for a position. Second, before the clinic closed, Carrasco and Defendant Adams "preselected" the non-pregnant women for positions in the other clinics. Third, Memorial Hermann was simultaneously eliminating positions in the clinic and establishing positions with the same job titles at the other locations, allowing Memorial Hermann to simply move the non-pregnant women "into their same job titles."

The Court finds that Memorial Hermann's closure of the clinic was in fact a reduction in force. It is undisputed that Memorial Hermann permanently closed the clinic for legitimate business reasons. There is no evidence to the contrary. No clinic employee was "replaced"; rather, the clinic shut its doors. Memorial Hermann terminated all clinic employees, including Macias, who had not been pregnant. These facts show that Memorial Hermann carried out a reduction in force. *See Meinecke v. H & R Block of Hous.*, 66 F.3d 77, 84 (5th Cir. 1995) (finding a "reduction in force" where the plaintiff's office was closed and the plaintiff's role eliminated); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 149–50 (5th Cir. 1995) (finding a "reduction in force" where the plaintiff's position was eliminated); *Enguita v. Neoplan USA Corp.*, No. Civ.A. B-04-121,

2005 WL 3279280, at *5 n.5 (S.D. Tex. Dec. 2, 2005) ("This case is a reduction-in-force case, because the discharge of Plaintiff stemmed from the closing of the entire Brownsville plant, not just Plaintiff's individual discharge.").

Plaintiffs' arguments to the contrary are inaccurate, conclusory, or not supported by the evidence. Even if one accepts Plaintiffs' argument that the rehired employees were never actually terminated, it is plainly inaccurate to say that Plaintiffs were the only terminated employees given that Macias, too, was terminated.[8] Moreover, Plaintiffs have offered conflicting evidence regarding their claim that Defendants "preselected" the non-pregnant employees for positions elsewhere. On one hand, Plaintiffs have produced Patterson's testimony regarding Carrasco's indication to her in June that Defendants had already decided to lay off the three Plaintiffs.[9] On the other hand, Plaintiffs' exhibits include Memorial Hermann's offers of employment to the rehired employees, and these letters are dated September 11 (for Margaret Watson and Rachel Magallanes) and September 12 (for Jeniffer Umana).[10] Even taking Plaintiffs' evidence as true, then, the evidence is somewhat ambiguous with respect to Plaintiffs' claim that "preselect[ion]" occurred as early as June. Furthermore, Defendants' creation of new nurse practitioner and medical assistant positions at the other locations is not incompatible with a reduction in force. The new positions only meant that not *all* employees at the closing clinic would ultimately be unemployed.

**The Applicable Prima Facie Case**

"To establish a prima facie case of intentional discrimination in a reduction-in-force case, a plaintiff must establish the following elements: (1) he is a member of a protected group; (2) he was adversely affected by the employer's decision; (3) he was qualified to assume another position

---

[8] Macias evidently made a deliberate decision not to re-apply. Perez Dep. 178; Adams Dep. 111–14.
[9] Patterson Dep. 21–22.
[10] Plaintiffs' Supplemented Response, Doc. No. 107, Exs. 7, 16, & 17.

at the time of discharge; and (4) there is sufficient evidence, either circumstantial or direct, from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action, or others who were not members of the protected class remained in similar positions." *Ortiz v. Shaw Grp., Inc.*, 250 F. App'x 603, 606 (5th Cir. 2007) (citing *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) and *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 812 (5th Cir. 1991)); *see also Enguita*, 2005 WL 3279280, at *5; *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999). "Generally, to establish a prima facie case, a plaintiff need only make a very minimal showing." *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

Memorial Hermann does not contest the first three elements. Directing its argument to the fourth element, Memorial Hermann argues that it terminated Plaintiffs, as well as a non-pregnant employee, because their clinic closed and they had not lined up other employment, not because of any discriminatory intent.

Plaintiffs' evidence, however, is sufficient to make the required "very minimal showing." *Thornbrough*, 760 F.2d at 639. Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in Plaintiffs' favor, the evidence shows not only that Defendants terminated Plaintiffs shortly after their pregnancies, but also that Defendants avoided "terminating" the non-pregnant employees, except for Macias, by moving them into positions elsewhere. This evidence satisfies the fourth prong of the prima facie case because it shows that others (Magallanes, Umana, and Watson) who were not members of the protected class remained in similar positions (i.e., maintained the same job title, albeit in a different clinic). It is true that the non-pregnant employees had to apply for the positions in other clinics, but at the prima facie

stage, the fact that the non-pregnant employees, except for Macias, avoided the layoffs while the formerly pregnant employees did not is enough to require Memorial Hermann to articulate reasons for this result. *See King v. True Temper Sports, Inc.*, No. 1:09CV168, 2011 WL 2224251, at *3 (N.D. Miss. June 7, 2011). This result from the reduction in force "exude[s] that faint aroma of impropriety" regarding potential discrimination that is sufficient at the prima facie stage. *See Thornbrough*, 760 F.2d at 643–44 ("[W]hat is suspicious in reduction-in-force cases is that the employer fired a qualified, older employee but retained younger ones. If we focus not on why employees, in general, were discharged, as the district court did, but instead on why the plaintiff rather than another employee was discharged, the discharge of an older employee rather than a younger one is initially unexplained. Under these circumstances, requiring the employer to articulate reasons for his decision to fire the plaintiff is appropriate.").

Although the evidence is scant, the Court finds that Plaintiff Adams, too, has established a prima facie case even though she never applied for a new position. Plaintiff Adams testified that she was still in the hospital, having given birth the previous day, when Carrasco called on August 26 to inform her that the clinic was closing and her position was being eliminated.[11] He also told her of the need to re-apply.[12] Plaintiff Adams testified that when she searched for the nurse practitioner position online on September 3, "there was no position to look at" and "[t]here was nothing there."[13] She testified that when she "got on the computer . . . on September 3rd, it was gone. So they might have posted something, but I didn't see it because it was not there."[14] She also

---

[11] Adams Dep. 7, 158–59.
[12] Adams Dep. 159.
[13] Adams Dep. 162–63.
[14] Adams Dep. 163.

subsequently mentioned that September 3rd is when she had "the strength and some energy to get on the computer" and look for available positions.[15]

In this same portion of testimony, however, Plaintiff Adams provided certain inconsistent statements about whether she *would have applied* if she had located a position online.[16] If Plaintiff Adams had stated that she would not have applied regardless, it would severely undermine, if not destroy, her case. She would not be able to show that Defendants treated her any differently from the non-pregnant employees—all faced termination if they did not re-apply (and Macias did go down this path). The Court, nonetheless, finds that, while her testimony is inconsistent at times, Plaintiff Adams did testify that she had an intent to re-apply in early September 2014. In particular, she testified: "like I said earlier, I wanted to apply for the Neighborhood Health Center and it wasn't available for me to apply for."[17] She testified that Carrasco "had told me to apply and I was going to apply and the position was not available."[18] She also stated that "I tried to apply for the Neighborhood Health Center position. That's the one I was trying to apply for, but it was not -- it

---

[15] Adams Dep. 167.
[16] Plaintiff Adams suggested at several times that she was not necessarily intent on submitting an application for rehire. *See* Adams Dep. 159–78. The following exchange is an example of Plaintiff Adams's equivocation:

> Q: And were there any nurse practitioner positions at all that were posted on Memorial Hermann's site as of September 3rd?
>
> A: Not that I can recall.
>
> Q: And if there were, would you have applied?
>
> A: I did not feel that that was something that I had to do.
>
> Q: So if you felt that you didn't have to apply for a position, why did you even spend your time on September 3rd going through and trying to apply?
>
> A: I tried to apply for the Neighborhood Health Center position. That's the one I was trying to apply for, but it was not -- it was no longer posted. . . .

Adams Dep. 173–74 (emphasis added).
[17] Adams Dep. 168.
[18] Adams Dep. 170.

14

was no longer posted."[19] At the summary judgment stage, this testimony is enough to manifest her intent or attempt to re-apply.

Viewing the evidence in the light most favorable to Plaintiff Adams and drawing every reasonable inference in her favor, the Court finds that Plaintiff Adams has established a prima facie case. A reasonable factfinder could conclude that Defendants prevented Plaintiff Adams from applying for a new position in light of the evidence that (1) she learned of the need to apply while in the hospital the day after giving birth, (2) she sought to apply to another clinic (i.e., neighborhood health center) within about a week (inconsistent as her testimony may have been), and (3) she could not locate any open positions at that time.[20] The factfinder could then find that preventing her from applying was discriminatory and led to the adverse employment action (i.e., termination) at issue. Accordingly, Plaintiff Adams has shown the fourth element of the prima facie case: sufficient evidence, either circumstantial or direct, from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action. Plaintiff Adams has therefore made the requisite, albeit minimal, showing and established a prima facie case, despite the fact that she never actually applied.

---

[19] Adams Dep. 174.

[20] Plaintiff Adams's ability to withstand summary judgment despite her failure to apply may find some additional support from caselaw addressing "failure to promote" claims under Title VII. In the failure-to-promote context, there is authority stating that "a formal application will not be required where a vacant position was not posted or where the normal hiring procedures did not entail formal application. In these situations, however, the plaintiff must show there was an available position and that she expressed some interest in a promotion or that the employer 'has some reason or duty to consider her for the post.'" *Dupont–Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 818 (S.D. Tex. 1998) (internal citations and brackets omitted); *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 794 (S.D. Tex. 1998) (stating the same rule). *But see Kolpakchi v. Principi*, 113 F. App'x 633, 637 (5th Cir. 2004) (stating that the Fifth Circuit has neither accepted nor rejected rules relaxing the necessity that the plaintiff actually file an application in employment-discrimination cases but observing that the District Court for the Southern District of Texas had accepted such a rule, citing *Dupont–Lauren* and *Lenihan*). Although the *Dupont–Lauren/Lenihan* principle of forgiving the failure to apply in certain circumstances addressed failure-to-promote claims, such a principle has some utility in a case like this one, where the Plaintiff could not locate a job posting and the employer had reason to know she would be interested in the position.

B.  Legitimate, Nondiscriminatory Rationale

Once Plaintiffs establish a prima facie case of pregnancy discrimination, the burden of production shifts to Memorial Hermann to articulate a legitimate, nondiscriminatory rationale for the layoffs. *See Burrell*, 482 F.3d at 411–12. Memorial Hermann states that it decided to close the clinic based on business justifications, including considerations related to patient volume and better uses for the space. Memorial Hermann then provides rationales for not rehiring each Plaintiff into available positions at the other two clinics.

With respect to Plaintiff Adams, Defendants state that they did not rehire her because she did not apply. Defendants add that Watson had an "Exceeds Expectation" rating for the 2013– 2014 period, while Plaintiff Adams received only a "Meets Expectation" rating. With respect to Perez, Defendants state that they did not rehire her because other applicants had better performance histories, she had a disciplinary warning for attendance problems, and her most recent performance-evaluation result was a rating of "Needs Improvement." In the case of Flores-Olvera, Defendants provide several reasons. First, she had disciplinary warnings in her file for attendance and attitude problems—in March 2012, her former manager counseled her for issues including lateness, failing to clock in, and failing to wear her name badge. Then, her supervisor gave her a written warning for walking out of counseling before it was finished. Moreover, the other applicants had better performance histories than her. In her most recent performance evaluation she had a "Meets Expectation" rating. In addition, she told Carrasco that she was only applying to the Northeast clinic because she did not want to work at the other clinic, which was problematic because Memorial Hermann expected employees to work at both locations when necessary.

Memorial Hermann has accordingly satisfied its burden to articulate a legitimate, nondiscriminatory rationale for the closing of the clinic and the decision not to rehire each of the

three Plaintiffs. *See E.E.O.C. v. Tex. Instruments*, 100 F.3d at 1181 (holding that a reduction in force is a legitimate, nondiscriminatory rationale).

C.  Pretext

When Defendants have articulated a legitimate, nondiscriminatory rationale for their decisions, Plaintiffs must show that Defendants' proffered rationale is a pretext. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The question is "whether plaintiff can satisfy her burden of presenting evidence from which a reasonable fact-finder could conclude that the defendants' stated reason for her discharge is not true but is, instead, a pretext for sex discrimination based on pregnancy." *Gerdin*, 908 F. Supp. 2d at 828.

**Performance Evaluations**

Plaintiffs advance a number of arguments to show pretext. First, Plaintiffs highlight Patterson's testimony that when she met with Carrasco in June 2014—before Defendants had announced the impending closure but after each Plaintiff became pregnant—he admitted that Defendants had already decided to terminate the three Plaintiffs.[21] Patterson testified that she asked Carrasco at that June meeting whether he and Defendant Adams had reviewed performance evaluations or corrective actions in reaching their decision to lay off the three Plaintiffs, and Carrasco said that they had not.[22] Patterson also testified that, as of the time she checked the records in January 2015, there were no 2013–2014 performance evaluations on file for Plaintiffs or anyone else employed at the clinic.[23]

At the summary judgment stage, the Court takes the nonmoving party's evidence as true and does not make credibility assessments. Patterson's testimony is therefore some evidence that

---

[21] Patterson Dep. 21–22.
[22] Patterson Dep. 22, 25–27.
[23] Patterson Dep. 78–81.

undercuts Defendants' position regarding why Plaintiffs were terminated and not rehired. If Defendants had already decided to terminate Plaintiff Adams in June, for instance, then her failure to apply may not be the reason why she was not rehired. Similarly, if Defendants had made their decisions in June, then Flores-Olvera's statement that she was only applying to the Northeast clinic because she did not want to work at the Northwest clinic may not have been a factor. Carrasco's alleged statement that he and Defendant Adams had not reviewed performance evaluations or corrective actions prior to reaching their decisions, coupled with Patterson's testimony that she could not even locate those records the following January, are at least somewhat in conflict with Defendants' claiming of those records as part of their rationale. Defendants insist that "performance reviews and the ratings simply memorialize Carrasco's assessment of the performance of these Plaintiffs." According to Defendants, their "position is, and has always been, that Defendants considered the SW [clinic] employees' performance generally in making decisions about which individuals to hire for open positions at other [clinics] — not that Carrasco specifically considered written performance reviews or corrective actions in making those assessments." Nonetheless, Defendants' express citation to Plaintiffs' reviews of "Meets Expectation" or "Needs Improvement" is somewhat incongruous with Patterson's testimony that they could not have reviewed those records prior to making rehiring decisions. Plaintiffs' testimony that Carrasco was in the clinic on something akin to a weekly basis rather than a daily basis[24] adds to the incongruity because it suggests that Carrasco was not well-positioned to make performance-based hiring decisions without reviewing the evaluations and corrective actions first.[25]

---

[24] *See* Perez Dep. 65; Flores-Olvera Dep. 75–76; Plaintiff Adams Decl. ¶ 5.
[25] Plaintiffs suggest that Patterson's inability to locate any records in January 2015 shows that Defendants later fabricated those records, which are part of the record in this case, for purposes of this litigation. There is no evidence to support such an allegation of fabrication.

**"Shifting" Rationales**

Additionally, Plaintiffs contend that Defendants' "shifting" reasons for not rehiring Plaintiff Adams and Flores-Olvera are evidence of pretext. Plaintiffs assert that, in response to the Equal Employment Opportunity Commission (EEOC) inquiry, Defendants stated that they terminated Plaintiff Adams (1) because she did not apply for a new position *and* (2) because Watson performed better during the 2013–2014 period, yet in this litigation, Defendants only put forth the first reason (i.e., that Plaintiff Adams did not re-apply). Likewise, according to Plaintiffs, Defendants informed the EEOC that they did not rehire Flores-Olvera because she indicated to Carrasco she was only interested in working at the Northeast clinic and because of repeated lateness, yet in this litigation, Defendants state that their rationale was that Flores-Olvera had disciplinary warnings in her file.

Defendants deny that their reasons have "shifted." Asserting that each reason they provided to the EEOC is sufficient on its own to justify their hiring decision, Defendants state that they have decided to argue only one in this litigation for the sake of judicial efficiency.

"[A]n employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual." *Burrell*, 482 F.3d at 412 n.11 (citing *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002)); *see also Caldwell v. KHOU–TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("An employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations."). The Fifth Circuit, however, has observed that "in those cases in which we have focused on inconsistent rationales, there has been otherwise strong evidence of pretext." *Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016).

As an initial matter, Plaintiffs' allegation that Defendants told the EEOC "something different" with respect to Flores-Olvera has little merit. Defendants stated to the EEOC that their rationale for not rehiring Flores-Olvera was (1) that she "advised Mr. Carrasco that she only wanted to work at the Northeast location," which was problematic because Memorial Hermann "required employees in this position to be flexible and potentially work at the other location on an as-needed basis," (2) that she "has been tardy to work on several occasions," and (3) that she had received a verbal counseling for tardiness in 2012 and a written warning for having an unprofessional and insubordinate attitude during the counseling.[26] In their MSJ, Defendants take essentially the same position. In the MSJ, Defendants do not reference being "tardy to work on several occasions," but Defendants do describe Flores-Olvera's counseling for "attendance-related issues."[27] Defendants also added in the MSJ that other applicants had superior performance histories. Otherwise, the explanations are consistent. These explanations have hardly shifted. Defendants' explanations for their decision not to rehire Flores-Olvera do not support an inference of pretext.

Plaintiffs' allegation that Defendants have provided "shifting" rationales with respect to Plaintiff Adams fares no better. Defendants do not contest that they offered two reasons for not rehiring Plaintiff Adams to the EEOC—first, that she did not apply, and second, that the nurse practitioner that they did hire for the position, Watson, had performed better—and now only rely on the first reason. Rather, Defendants contend that they had "a primary and secondary reason"

---

[26] Plaintiffs' Supplemented Response, Doc. No. 107, Ex. 32, at 3.
[27] Plaintiffs argue that "Defendants pinned attendance issues on Plaintiff Flores-Olvera that did not belong to her." As evidence, Plaintiffs cite the fact that Defendants produced documents during discovery that related to another employee rather than Flores-Olvera. Defendants acknowledge that during discovery they "inadvertently produce[d] some of the personnel records of another employee with a nearly identical name," but state that "there is absolute[ly] no evidence that when making employment decisions, Defendants relied on someone else's personnel records." Plaintiffs have produced no evidence to show that Defendants' production of documents relating to the wrong employee was anything more than a discovery mistake.

for their decision, and since each is a sufficient basis for the decision on its own, they only argued one in their MSJ for the sake of "judicial efficiency."

It is undisputed that Plaintiff Adams did not apply to be rehired. Since that fact constitutes a legitimate, nondiscriminatory reason for not rehiring her, the Court finds that Defendants were not required to argue that Watson was also a stronger performer. Additionally, the Court notes that Defendants did in fact reference Watson's superior performance history in their MSJ.[28] Plaintiffs' claim that Defendants have proffered "shifting" rationales for their failure to rehire Plaintiff Adams adds little support.

**Defendant Adams's Statements**

According to Patterson's testimony, Defendant Adams had previously expressed her opinion to Patterson that Defendant Adams was frustrated with employees taking FMLA leave and the disruption it entailed. Patterson testified that in their conversations, Defendant Adams "was very clear that FMLA was a disruption . . . she stated that FMLA, we shouldn't have. There should be something we could do as far as employees who were on FMLA."[29]

"Where a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct," the "plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)); *see also Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 349 (5th Cir. 2013) (applying the *Reed* test in a racial-discrimination suit); *Lay v. Singing River Health Sys.*, 694 F. App'x 248, 256 (5th Cir. 2017). The Fifth Circuit distinguishes this "more flexible two-part test" from the

---

[28] *See* Defendants' MSJ, Doc. No. 53, 9 n.7.
[29] Patterson Dep. 97.

four-part *CSC Logic* test used when a plaintiff cites remarks as direct evidence of discrimination.[30] *Reed*, 701 F.3d at 441; *see also Hoffman v. Baylor Health Care Sys.*, No. 3:12–CV–3781–L, 2014 WL 772672, at *14 n.10 (N.D. Tex. Feb. 27, 2014).

Plaintiffs only reference Patterson's testimony about Defendant Adams's alleged remarks in a footnote in the facts section of their briefing and do not reference it thereafter. In light of this treatment of Defendant Adams's alleged remarks and given that Plaintiffs model their overall argument on the *McDonnell Douglas* framework, the Court will construe the remarks as part of Plaintiffs' circumstantial evidence of discrimination. Taking Patterson's testimony as true, Defendant Adams's alleged comments indicate that she, if not Memorial Hermann, had at least some animus towards FMLA leave, which would include pregnancy-related leave, and leave-takers. Furthermore, Patterson testified that Carrasco told her at their June 2014 meeting that it was Defendant Adams who made the decision to lay off the three Plaintiffs.[31] The alleged remarks, then, evince some discriminatory animus on the part of a person who, according to Carrasco's alleged statement, was primarily responsible for the challenged employment action. Under the *Reed* two-part test, Defendant Adams's alleged comments consequently have some tendency to show that Defendants' proffered explanation is a pretext meant to conceal discrimination against pregnant, leave-taking employees.

**The "Only" Employees Terminated**

Plaintiffs state that the "only individuals that were terminated were the Plaintiffs." For the reasons stated in the above discussion of Plaintiffs' prima facie case, this statement is clearly

---

[30] *CSC Logic* was an age-discrimination case, and the Court set out the following four-part test: age-related remarks "may serve as sufficient evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996).
[31] Patterson Dep. 22–23.

inaccurate. It is nonetheless true that three of the four employees whom Memorial Hermann terminated and did not rehire were the Plaintiffs. In other words, out of an office of seven women (excluding the clinic doctor), Defendants laid off all employees including Macias and the three employees who had been pregnant, but rehired three non-pregnant employees.

Although Plaintiffs do not expressly characterize their argument as a statistical one, their argument that Defendants laid off "only" the three pregnant Plaintiffs suggests that Plaintiffs are citing evidence of a discriminatory pattern. That is, Plaintiffs suggest that the pattern of layoffs and rehires is indicative of discrimination.

Courts treat such pattern-based evidence, even if it involves simple numbers, as statistical evidence. *See, e.g.*, *Crim v. Helfer*, 77 F.3d 479, *2 (5th Cir. 1996) (calling evidence "statistical evidence" where it showed that 7 of the 8 employees who were retained were under 40 years old while 2 of the 4 employees who were not retained were over 40 years old); *King*, 2011 WL 2224251, at *4 (treating evidence as statistical evidence where it showed that two of the three laid-off supervisors were the oldest supervisors in the department).

"[A]lthough statistical data may occasionally establish pretext where it is combined with additional evidence, it is generally insufficient to raise a genuine issue of material fact in cases where a plaintiff puts forward no additional evidence that a specific nondiscriminatory reason is pretextual." *Jackson*, 619 F.3d at 468 (citing *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 820 (5th Cir. 1990)); *see also Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) (stating that "proof of pretext, hence of discriminatory *intent*, by statistics *alone* would be a challenging endeavor"). "[S]tatistical evidence usually cannot rebut the employer's articulated nondiscriminatory reasons." *E.E.O.C. v. Tex. Instruments*, 100 F.3d at 1184.

Nonetheless, "gross statistical disparities resulting from a reduction in force or similar evidence may be probative of discriminatory intent, motive or purpose." *Walther*, 977 F.2d at 162; *see also DeCorte v. Jordan*, 497 F.3d 433, 438–40 (5th Cir. 2007) (upholding a jury verdict due to, among other reasons, statistics showing that when the new district attorney took office, the non-lawyer staff consisted of 77 whites, 56 African Americans, 2 Hispanics, and 1 Asian, while 72 days later, it consisted of 27 whites and 130 African Americans, with the pool of terminated employees consisting of 53 whites, 1 Hispanic, and 2 African Americans). And statistics "may be probative of pretext in limited circumstances." *E.E.O.C. v. Tex. Instruments*, 100 F.3d at 1185. "The probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination." *Id.*

Statistical evidence based on small samples, however, tends to lack probative value. *See Crim*, 77 F.3d at *2. In *Crim*, for example, the Federal Deposit Insurance Corporation cut the number of section-chief positions from 12 to 8 when it merged its offices in Addison, Texas, and Dallas, Texas. *Id.* at *1. The 62-year-old plaintiff, a former section chief who lost his position in the merger, brought an age-discrimination suit. *Id.* The plaintiff offered as evidence the fact that out of the 8 retained section chiefs, 7 were younger than 40 years old, while out of the 4 section chiefs not retained, 2 were older than 40 years old. *Id.* at *2. Finding that this evidence did not show pretext, the Fifth Circuit stated: The plaintiff's "statistical evidence does not establish an age discrimination claim because it only analyzes twelve employees. Statistical evidence on small groups of employees cannot be used to establish an employer's discriminatory intent." *Id.*; *see also Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 663 (9th Cir. 2002) ("declin[ing] to give . . . much weight" in a racial-discrimination suit to the fact that three of the four workers laid off on a particular night were white "because the sample size is so small").

District courts within the Fifth Circuit have often accorded little weight to statistical evidence based on relatively small sample sizes in employment-discrimination cases. *See King*, 2011 WL 2224251, at \*4 (finding that "the small statistical sample offered" by the plaintiff, namely that two of the three laid-off supervisors were the oldest supervisors in the department, "is simply insufficient [to] allow an inference of age discrimination"); *Jefferson v. MillerCoors, LLC*, No. 4:09–CV–363–A, 2010 WL 2670806, at \*6–7 (N.D. Tex. July 2, 2010) (refusing to treat the alleged fact that all 10 laid-off employees, out of a pool of 40, were over 40 years old and the alleged fact that 8 were over 60 years old as evidence of pretext and stating that "[r]aw numbers or statistics such as those presented by[]plaintiff, devoid of context, are insufficient to prove pretext absent additional evidence of pretext"); *Jones v. Stuart C. Irby Co.*, No. 3:08cv603–DPJ–JCS, 2009 WL 3305542, at \*5 (S.D. Miss. Oct. 14, 2009) (finding the fact that all 8 terminated employees were over 40 years old did not show pretext in an age-discrimination suit because the evidence lacked context and stating that "[s]uch context is necessary" partly "because the reduction in force involved a relatively small number of employees"); *Felton v. Polles*, No. Civ.A. 3:99CV200LN, 2001 WL 34084145, at \*5 (S.D. Miss. Jan. 23, 2001) (concluding that an African-American plaintiff in a racial-discrimination suit had not shown "that his is the unusual case in which statistics alone should create an issue of fact as [to] pretext" where Mississippi had purportedly hired 86 conservation officers since 1990, 83 of whom were white and 3 of whom were African-American).

On the other hand, courts have occasionally accepted statistics based on relatively small sample sizes as probative of pretext. *See Deal v. Louisiana*, No. 11–743–JJB, 2013 WL 3423116, at \*4–5 (M.D. La. July 8, 2013) (ruling that statistical evidence allowed an inference of pretext where it showed that 16 of 17 employees terminated on a particular date were over 40 years old,

even though that date was not the date on which plaintiff was terminated); *Taylor v. Albemarle Corp.*, No. 04-398-JVP-DLD, 2007 WL 9700753, at *10–11 (M.D. La. Feb. 13, 2007) (finding that the plaintiff had sufficiently shown pretext based on evidence that, out of a pool of 55 employees, all 6 terminated employees were over 40 years old and none of the 17 employees under 40 years old were terminated).

In this case, three of the four employees whom Memorial Hermann terminated and did not rehire had recently been pregnant (the fourth individual is the employee who deliberately did not re-apply). The evidence also shows, however, that Defendants informed *all* clinic employees (again excluding the clinic doctor) that they would be terminated when the clinic closed unless they secured employment at another location, and then Defendants rehired three of the seven employees for positions in other clinics. Although Defendants technically could not have hired Plaintiff Adams because she did not apply, the Court has already found a genuine fact issue regarding whether Defendants prevented Plaintiff Adams from applying. It follows that Defendants essentially passed over not only Perez and Flores-Olvera, but also Plaintiff Adams, in favor of non-pregnant employees. Still, passing over three recently pregnant employees to rehire three non-pregnant employees does not yield a "gross statistical disparit[y]," and it does not provide a large enough sample size for the Court to infer discrimination on the basis of raw numbers or statistics alone. *See Walther*, 977 F.2d at 162.

Consequently, raw numbers or statistics alone, while perhaps having some probative value, are not sufficient in and of themselves to create a fact issue around whether Defendants' nondiscriminatory rationale is pretextual. *See E.E.O.C. v. Tex. Instruments*, 100 F.3d at 1185. The probative value, if any, of the decision to rehire three non-pregnant employees over three recently

pregnant employees will "ultimately depend[] on all the surrounding facts, circumstances, and other evidence of discrimination." *See id.*

**Failure to Follow Internal Procedures**

As additional evidence of pretext, Plaintiffs cite Defendants' alleged failure to follow Memorial Hermann's internal procedures with respect to adhering to the "closure procedure," creating annual performance reviews, and handling discipline for attendance issues. Plaintiffs cite *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 396 (5th Cir. 2002) ("An employer's conscious, unexplained departure from its usual polic[i]es and procedures when conducting a RIF may in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiff's age.").

Patterson testified that Memorial Hermann had a "closure procedure" that set forth "how to go through a closure and position elimination."[32] Plaintiffs allege that Defendants did not follow the closure procedure, but Plaintiffs have produced no admissible evidence to support that allegation. Plaintiffs have produced no evidence, besides Patterson's vague testimony that such a procedure existed, to show that Memorial Hermann had a closure procedure or how it was supposed to work. Plaintiffs have accordingly offered no evidence on which the Court could base a finding on a claim that Defendants deviated from a closure procedure.

As part of their deviation-from-procedures argument, Plaintiffs point to Defendants' use of 2013–2014 performance evaluations to make rehiring decisions despite the fact that the full performance-evaluation process had not yet occurred. Patterson testified that the performance-evaluation process involves multiple steps over several months: a self evaluation happens in July or August, the supervisor then completes her portion, and then in late October or November the

---

[32] Patterson Dep. 23.

supervisor meets with the employee to review the evaluation.[33] After the in-person meeting, employees who disagree with their evaluations could still contest them before the evaluations became final.[34] Plaintiffs argue that Defendants' invocation of 2013–2014 performance evaluations is suspicious because the rehiring and termination decisions occurred before the evaluation process had finished. Defendants respond that Plaintiffs never met with their supervisor to receive their 2013–2014 performance evaluations simply because of timing: as Patterson testified, employees would meet with their supervisor to discuss performance evaluations in October or November, so those meetings had not occurred by the time the clinic closed on September 30.

Based on this evidence, there does not appear to be any failure to follow internal procedures that would support a showing of pretext. Plaintiffs' evidence at most shows that Defendants created 2013–2014 performance evaluations without going through the full evaluation process, depriving Plaintiffs of their opportunity to challenge their evaluations, but this abbreviated evaluation process is not inherently suspicious because the clinic closed and Plaintiffs were terminated before the full process would have finished.

Plaintiffs also argue that Defendants failed to follow Memorial Hermann's procedures governing discipline for attendance issues. This argument, however, misses the mark by a wide margin. Plaintiffs point to Memorial Hermann's attendance policy, which calls for a verbal warning after four "occurrences" and termination after eight.[35] Plaintiffs argue that Defendants violated this internal policy by "using one occurrence of an attendance issue as a means to terminate" Flores-Olvera and Perez. Plaintiffs also argue that Defendants suspiciously did not

---

[33] Patterson Dep. 82–85.
[34] Patterson Dep. 86.
[35] Plaintiffs' Supplemented Response, Doc. No. 107, Ex. 36, at 2.

"rectify, warn . . ., or terminate" Plaintiffs in light of their corrective actions until Plaintiffs became pregnant and took FMLA leave. These arguments are groundless. Defendants' position, which is supported by Defendant Adams's declaration, is that they decided to close the clinic "based on various business justifications."[36] Plaintiffs have not disputed that Defendants closed the clinic for legitimate business reasons. There is no evidence that Defendants closed the clinic and laid off all clinic employees who had not secured employment at another location in order to discipline employees for corrective actions or attendance issues. Plaintiffs now challenge the basis for Defendants' rehiring decisions, but such a challenge does not implicate a failure to follow internal procedures regarding terminations for attendance problems in the ordinary course of business.

Plaintiffs further allege that Defendants' purported consideration of corrective actions more than one year after their issuance violated Memorial Hermann policy. Patterson testified that, under Memorial Hermann policy, corrective actions would only be considered when making employment decisions for one year following their issuance.[37] After one year had passed, Memorial Hermann would no longer consider the corrective action, according to Patterson.[38] It is true that Defendants cite a corrective action for Perez from May 2012[39] and a corrective action for Flores-Olvera from March/April 2012,[40] and these corrective actions came more than one year before Defendants say they made rehiring decisions in September 2014. Defendants freely admit that when making rehiring decisions, "Plaintiffs' entire performance history was reviewed and considered by Carrasco." Taking Patterson's testimony as true (even though the Court can conceive of firmer sources of evidence showing Memorial Hermann's corrective-action policy and

---

[36] Defendant Adams Decl. ¶ 6.
[37] Patterson Dep. 69–70, 73.
[38] Patterson Dep. 69–70, 73.
[39] Defendants' MSJ, Doc. No. 53, Ex. C-5.
[40] Defendants' MSJ, Doc. No. 53, Ex. D-17.

how it works), there is therefore some evidence that Defendants deviated from Memorial Hermann's internal procedures regarding consideration of corrective actions. Such a deviation hardly has much probative value when it comes to showing that Defendants' performance-based rationale is pretextual.

**Other Arguments**

Plaintiffs make several additional arguments that lack citations to evidence and/or are unsupported by the cited evidence. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Plaintiffs state that non-pregnant employees were provided with "job requisition numbers" that allowed them to immediately locate the available positions (presumably online), while Plaintiffs did not receive such numbers and had to try to find the available positions on their own. Plaintiffs, however, cite only Plaintiff Adams's deposition testimony for this alleged fact, and her relatively vague testimony does not show that such disparate treatment occurred.[41] Additionally, Plaintiffs state that "all of the Plaintiffs received exemplary performance evaluations," but cite no evidence for this statement.

**The Totality of the Evidence**

Viewing the evidence as a whole, taking all proper summary judgment evidence as true, and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Defendants have failed to show that there is no triable issue of fact regarding Title VII pregnancy discrimination.

---

[41] *See* Adams Dep. 166–67.

Patterson's testimony that Defendants had already decided to terminate and not rehire Plaintiffs in June, that Carrasco said Defendants had not considered performance evaluations or corrective actions when making their decisions, that she did not see any 2013–2014 evaluations when she checked for them in January 2015, and that Defendant Adams had expressed hostility to FMLA and the distraction it entailed is evidence of both pretext and gender discrimination. While statistics or raw numbers alone tend to lack probative value, when viewed in light of the surrounding facts, circumstances, and other evidence of discrimination, the fact that Defendants passed over three recently pregnant employees in favor of three non-pregnant employees adds an extra measure of weight to Plaintiffs' case. Overall, the Court finds that Plaintiffs have produced enough evidence to merit trying their Title VII case.

## V.      The Family and Medical Leave Act

The FMLA, 29 U.S.C. § 2601 *et seq.*, gives eligible employees the right to take leave for certain reasons, among them "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A).

The FMLA contains "two distinct provisions." *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998). "First, it provides certain entitlements. An eligible employee of a covered employer has the right to take unpaid leave for a period of up to 12 workweeks in any 12–month period" for enumerated reasons, including the birth of the employee's child and the ensuing need to care for the child. *Id.* (citing 29 U.S.C. § 2612(a)(1)(A)). "Following a qualified leave period, the employee is entitled to reinstatement to the former position or an equivalent one with the same benefits and terms." *Id.* (citing 29 U.S.C. § 2614(a)). "Second, the Act protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights." *Id.* "It is 'unlawful for any employer to interfere with, restrain, or deny the exercise of or

the attempt to exercise, any right[] provided under' the Act." *Id.* (quoting 29 U.S.C. § 2615(a)(1)). "Further, an employer is prohibited from discriminating or retaliating against an employee for exercising his rights under the Act." *Id.* (citing 29 U.S.C. § 2615(a)(2)).

Plaintiffs have pleaded both interference with their FMLA rights and retaliation following the exercise of those rights. It is undisputed that Plaintiffs and Memorial Hermann are covered by the Act.

### A. FMLA Retaliation

"The Fifth Circuit applies the *McDonnell Douglas* framework to analyze retaliation claims under the FMLA, noting that 'there is no significant difference between such claims under the FMLA and similar claims under other anti-discrimination laws.'" *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001) (quoting *Chaffin v. John H. Carter Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999)), *abrogated on other grounds by Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016). The prima facie case for unlawful retaliation under the FMLA consists of showing, for each Plaintiff, that: "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Id.* For purposes of the prima facie case, showing that "the adverse decision was made because she took FMLA leave" does not require "an ultimate showing of liability"; rather, "[a]ll that is required is 'a causal connection between the protected activity and the discharge.'" *Grubb v. Sw. Airlines*, 296 F. App'x 383, 390 (5th Cir. 2008) (quoting *Chaffin*, 179 F.3d at 319).

In its discussion of Title VII pregnancy discrimination above, the Court found that there is a triable question of fact regarding whether Defendants discriminated against Plaintiffs after they

became pregnant and took leave (under the FMLA). For the reasons stated in the Title VII section above, the Court now finds that Plaintiffs have satisfied the prima facie case for FMLA retaliation and have produced enough evidence to survive summary judgment on the issue of whether Defendants terminated and did not rehire Plaintiffs as retaliation for exercising their FMLA leave rights after becoming pregnant.

### B. FMLA Interference

Plaintiffs contend that Defendants are liable for FMLA interference because Defendants did not reinstate Plaintiffs to their original (or equivalent) positions when their FMLA leave ended. As stated above, the FMLA grants an employee who is returning from FMLA leave an entitlement "to be restored . . . to the position of employment held by the employee when the leave commenced" or "to an equivalent position." 29 U.S.C. § 2614(a)(1). When an employer fails to comply with this entitlement, the employee has a claim under 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) (stating that the employee's right to reinstatement is one of the "prescriptive or substantive FMLA rights; claims for violations of these rights invoke entitlement or interference theories and are brought under § 2615(a)(1)"); *McArdle v. Dell Prods., L.P.*, 293 F. App'x 331, 334 (5th Cir. 2008) ("An employer's failure to restore an employee to the same or equivalent position gives rise to an entitlement claim under 29 U.S.C. § 2615(a)(1).").

Although Flores-Olvera and Perez returned to work after their FMLA leave ended, according to Plaintiffs such a return does not qualify as a reinstatement because it was only for the final days or weeks of the clinic's existence. The clinic closed while Plaintiff Adams was still on FMLA leave. Plaintiffs argue that "there were other (comparable) positions for which Plaintiff

Adams (and the other Plaintiffs) should have automatically been placed into." Defendants contend that Flores-Olvera and Perez have no claim for interference because they received everything due to them under the FMLA: they applied for leave, took leave, and returned to work after their leave expired. With respect to Plaintiff Adams, Defendants reiterate that she failed to apply for a new position after notice of the impending closure. Defendants cite federal regulations to argue that the FMLA does not protect an employee's job if the job would have been eliminated anyway. *See* 29 C.F.R. § 825.216 ("If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave . . . and restore the employee cease at the time the employee is laid off . . . . An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.").

The Court finds that there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law on Plaintiffs' claims for FMLA interference. At the outset, it is important to state that Plaintiffs' beliefs about the degree of job protection afforded under the FMLA are incorrect as a matter of law. Plaintiffs assert that, even if an employee's job is eliminated for reasons unrelated to the employee's use of FMLA leave, the employee is "automatically" entitled to bypass the application process for other jobs with the employer and receive a new position by virtue of having taken FMLA leave.[42] This assertion runs afoul of federal

---

[42] Plaintiff Adams's deposition testimony shows that she shares this mistaken understanding of FMLA rights:

> Q: And if there was only one position available at another Neighborhood clinic after the Southwest facility closed, is it your understanding that you should have received that position over another employee such as Margaret Watson because you were on FMLA?

> A: Yes.

> Q: And your understanding of the FMLA is that if you have two employees and one is on FMLA and one is not on FMLA, the one on FMLA is guaranteed a right of reinstatement over the employee who's not on FMLA?

regulations, the FMLA itself, and Fifth Circuit caselaw establishing limits on an employee's right to reinstatement.

Federal regulations provide that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). The FMLA itself states that it does not "entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). The applicable federal regulations go on to provide that "[i]f an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave . . . and restore the employee cease at the time the employee is laid off . . . ." 29 C.F.R. § 825.216(a)(1). The employer has "the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." *Id.* "That an employee is not guaranteed an absolute right to reinstatement following a qualified absence," the Fifth Circuit has observed, "is not only a matter of common sense, but also a principle reflected in this circuit's pattern jury instructions and in the opinions of a significant majority of other circuit courts." *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 682 (5th Cir. 2013) (internal quotations and brackets omitted); *see also Forbes v. Unit Tex. Drilling, L.L.C.*, 526 F. App'x 376, 380 (5th Cir. 2013) ("An employee has no right to reinstatement if the employee's prior position has been eliminated."). Accordingly, to the

---

A: Yes.

Q: So it would have been fair for Memorial Hermann to terminate Ms. Watson because she wasn't on FMLA; is that your understanding?

A: If they had one position available, I believe that position belonged to me.

Adams Dep. 160–61.

extent Plaintiffs argue that their FMLA rights were interfered with because they should not have had to apply for positions elsewhere and instead should have automatically been awarded the other positions (unlike their non-leave-taking colleagues), the argument is groundless.

Under this caselaw and these provisions of the applicable statutes and Code of Federal Regulations, Plaintiff Adams's claim for FMLA interference fails as a matter of law. Defendants have shown that they terminated Plaintiff Adams when the clinic in which she worked closed on September 30 and she had not secured continuing employment in another location. Her position was eliminated. The clinic would have closed and her position would have been eliminated regardless of whether she was exercising her FMLA leave at the time. Defendants therefore did not interfere with her FMLA entitlements. *See* 29 C.F.R. § 825.216(a)(1); *Forbes*, 526 F. App'x at 380. To hold otherwise and find that Plaintiff Adams had a right to continue working for Memorial Hermann upon her return in November even though the other, non-leave-taking employees in the clinic had no such right would amount to the sort of preferential treatment that the law explicitly proscribes. *See* 29 C.F.R. § 825.216(a).

Likewise, Defendants are entitled to judgment as a matter of law on the FMLA interference claims brought by Flores-Olvera and Perez. It is undisputed that Flores-Olvera and Perez were granted the leave to which they were entitled and subsequently returned to work. Flores-Olvera and Perez make no allegation that their post-leave positions were any different from their pre-leave positions.

To support their claims of interference, Flores-Olvera and Perez cite a pair of cases for the proposition that allowing employees to return from leave but terminating them shortly thereafter does not qualify as reinstatement. *See Ostermyer v. Toledo Clinic, Inc.*, No. 3:03CV7736, 2005 WL 927120, at *2, *5 (N.D. Ohio Apr. 18, 2005) (acknowledging that "the FMLA does not entitle

an employee to a perpetual position with her employer" but finding "no support for the proposition that an employer may skirt its reinstatement obligations merely by allowing an employee to work for a short period after receiving notice of her termination" where the employer restored the employee for two weeks); *Burke v. Lab. Corp. of Am.*, No. 8:08cvo2072oTo24oTGW, 2009 WL 3242014, at *5 (M.D. Fla. Oct. 6, 2009) ("Returning to a position only long enough to be fired does not amount to a meaningful reinstatement under the" FMLA.). Although the *Ostermyer* ruling provides some support for the general theory of interference advanced by Flores-Olvera and Perez, the *Ostermyer* plaintiff was not running up against the sort of fixed office-closure date that Flores-Olvera and Perez were. *Ostermyer*, 2005 WL 927120, at *2. That Flores-Olvera and Perez only worked in the clinic for a few days or weeks after returning from leave is more a function of the timing of their FMLA leave and the clinic's closure date than of any affirmative termination decision by Defendants. Moreover, *Ostermyer* ultimately granted summary judgment to the employer on the plaintiff's FMLA interference claim,[43] holding that the plaintiff would have been terminated due to what was "essentially" a reduction in force regardless of whether she took FMLA leave and therefore had no right to reinstatement. *Id.* at *5 ("[T]he right to reinstatement under the FMLA is not absolute. An employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave." (citing *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003))). *Ostermyer* is consequently of little help to Flores-Olvera and Perez.

*Burke* is likewise distinguishable because the plaintiff was also not running up against a fixed office-closure date and because the plaintiff was terminated *three minutes* after her return from FMLA leave. *See Burke*, 2009 WL 3242014, at *1–2. The plaintiff retrieved her belongings

---

[43] The *Ostermyer* Court refers to the claim as an "FMLA entitlement" claim, but this wording is merely a different way of referring to an FMLA interference claim. Both in *Ostermyer* and in this case, the claim is based on the employer's alleged failure to restore the plaintiff to her pre-leave position (or an equivalent position).

and left the office that same day. *Id.* at \*5 & n.10. "While the FMLA does not require an employer to keep an employee indefinitely after she returns from medical leave," the *Burke* Court wrote, "the law's protections extend beyond reinstating a person to a job for three minutes." *Id.* at \*5. The plaintiff's termination three minutes after returning from leave to an office that continued to operate after her termination[44] contrasts with the facts of this case, where Flores-Olvera and Perez returned from leave and worked the remaining time left until the clinic permanently shuttered. *Burke* is not sufficiently comparable to guide the Court's analysis of the FMLA interference claims in this case.

Since the evidence shows that Flores-Olvera and Perez were restored to their positions and were granted all other rights to which they were entitled under the FMLA, the Court finds that there is no genuine dispute as to any material fact regarding their FMLA interference claims.

The Court accordingly finds that Defendants are entitled to summary judgment on all three Plaintiffs' claims for FMLA interference. As a matter of law, Defendants did not deny Plaintiffs the right to reinstatement or any other benefit to which they were entitled under the FMLA. This conclusion, however, does not affect the Court's previous findings regarding *retaliation* under the FMLA and discrimination under Title VII—the factfinder at trial must decide whether Defendants' actions during the period when they closed the clinic and rehired certain employees give rise to liability for FMLA retaliation or Title VII discrimination.

VI.    Conclusion

For the reasons stated above, the Court denies Defendants' Motion for Summary Judgment on Plaintiffs' claims for Title VII discrimination and FMLA retaliation. The Court grants

---

[44] There is no reason to believe that the Tampa office where the plaintiff worked closed after her termination. The plaintiff's position was the only one that the employer eliminated in that office. *Burke*, 2009 WL 3242014, at \*1.

Defendants' Motion for Summary Judgment on Plaintiffs' claims for FMLA interference.

Furthermore, the Court denies the parties' cross Motions to Disqualify Counsel.

Signed at Houston, Texas, on this ___9th___ day of November, 2018.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

# APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DELISE ADAMS, GLORIA FLORES-OLVERA, and JUDY PEREZ, | § § § | |
| Plaintiffs, | § § | |
| V. | § § | CIVIL ACTION NO. 4:15-CV-01270 |
| MEMORIAL HERMANN, CHIPS ADAMS, and ARNOLD CARRASCO, | § § § | |
| Defendants. | § § | |

## **APPENDIX**

The Court grants the following objections to Jacqueline Patterson's deposition testimony

due to the attorney–client and/or work-product privileges:

- Page 48: Lines 8–25
- Page 49: Lines 17–22
- Page 50: Lines 6–11 [objection to all of the answer following the word "yes"]
- Page 62: Line 12 through Page 64: Line 4
- Page 66: Line 11 through Page 67: Line 14
- Page 68: Lines 3 [after the word "process"]-4
- Page 68: Line 24 through Page 69: Line 7
- Page 71: Line 19 through Page 72: Line 25
- Page 73: Line 14 through Page 74: Line 13
- Page 75: Line 3 through Page 77: Line 5
- Page 78: Lines 1–15
- Page 93: Line 6 through Page 94: Line 6

The Court also grants the Best Evidence Rule objections to the following:

- Page 38: Lines 5–19
- Page 233: Line 24 through Page 236: Line 22
- Page 238: Line 2 through Page 239: Line 24

The remaining objections are overruled.